## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **STATE OF INDIANA,** ) | |
| **By Attorney General Greg Zoeller** ) | **CASE NO.:  15-12309** |
| ) | |
| **PLAINTIFF,** ) | |
| ) | **COMPLAINT FOR DAMAGES** |
| ) | **AND INJUNCTIVE RELIEF** |
| ) | **JURY TRIAL DEMANDED** |
| **v.** ) | |
| ) | |
| **American Furukawa, Inc.; Delphi** ) | |
| **Automotive LLP; Delphi Automotive** ) | |
| **System, LLC; Denso Corporation; Denso** ) | |
| **International America, Incorporated;** ) | |
| **Fujikura Ltd.; Furukawa Electric** ) | |
| **Company, Limited; G.S. Electech, Inc.; G.S.** ) | |
| **Wiring Systems Inc.; G.S.W.** ) | |
| **Manufacturing, Inc.; K&S Wiring Systems,** ) | |
| **Inc.; Kyungshin-Lear Sales and** ) | |
| **Engineering, LLC; Lear Corporation; Leoni** ) | |
| **Wiring Systems, Inc.; Leonische Holding** ) | |
| **Inc.; S-Y Systems Technologies America,** ) | |
| **LLC; Sumitomo Electric Industries,** ) | |
| **Limited; Sumitomo Electric Wintec** ) | |
| **America, Inc.; Sumitomo Electric Wiring** ) | |
| **Systems, Inc.; Sumitomo Wiring Systems** ) | |
| **(U.S.A.) Inc.; Sumitomo Wiring Systems,** ) | |
| **Ltd; TRAM, Incorporated, d/b/a Tokai** ) | |
| **Rika USA, Incorporated; Tokai Rika** ) | |
| **Company, Ltd.; Yazaki Corporation,** ) | |
| **Yazaki North America, Incorporated,** ) | |
| ) | |
| **DEFENDANTS.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

1

## PRELIMINARY STATEMENT

Attorney General, Greg Zoeller brings this action on behalf of the State of Indiana, itself, as well as all Indiana political subdivisions (as defined in Ind. Code § 34-6-2-110) who purchased Automotive Wire Harness Systems (defined below) manufactured by Defendants. This action arises from criminal charges and indictments by the U.S. Department of Justice related to price fixing by manufacturers of Automotive Wire Harness Systems, subsequent guilty pleas by various co-conspirators, and criminal fines paid to the U.S. government. The illegal scheme conducted by Defendants in this action artificially inflated the prices of Automotive Wire Harness Systems, which were sold throughout the State of Indiana as components of automobiles and other vehicles. Defendants' wrongdoing has affected each sale of Automotive Wire Harness Systems sold in the State of Indiana. Accordingly, this action seeks injunctive relief, restitution, damages and civil penalties for each violation. Plaintiff brings this action based on personal knowledge as to itself and on information and belief as to all other matters, as alleged herein.

## I.      INTRODUCTION

1.      This case arises out of a conspiracy extending from at least January 1, 2000 through at least January 1, 2010, (the "Period") to rig bids for, and to fix, raise, stabilize, and maintain prices, of automotive parts including Wire Harness Systems sold indirectly to Plaintiff and others throughout the United States.

2.      During the Period, Defendants and their co-conspirators conspired to illegally restrict competition in the market for automotive parts, specifically targeting indirect purchaser consumers and affecting billions of dollars of commerce throughout the United States, including Indiana. The conspiracy included communications and meetings in which Defendants agreed to

eliminate competition and to rig bids for, and to fix the prices of, automotive parts including Automotive Wire Harness Systems.

3.      Defendants and their co-conspirators manufactured Wire Harness Systems and related products: (1) in the United States for installation in vehicles manufactured and sold in the United States; (2) in Japan for export to the United States, for installation in vehicles manufactured and sold in the United States; and (3) in Japan for installation in vehicles manufactured in Japan for export and sale in the United States.

## II.      NATURE OF ACTION

4.      This lawsuit is brought by Plaintiff, on behalf of itself and all Indiana political subdivisions, and is an action against Defendants, the largest suppliers of Wire Harness Systems globally and in the United States, for engaging in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products. Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

5.      "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle. Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle. Automotive Wire Harness Systems include the following: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and Speed Sensor Wire Assemblies.

6.      The Delphi Defendants, the Denso Defendants, the Fujikura Defendants, the Furukawa Defendants, the Lear Defendants, the Leoni Defendants, the Sumitomo Defendants, S-

Y Systems, the Yazaki Defendants, the Tokai Rika Defendants, and the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufacture, market, and sell automotive parts including Wire Harness Systems throughout the United States. The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

7.     Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of automotive parts, including Wire Harness Systems.

8.     Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for automotive parts since at least February 2010. As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anti-competitive conduct in the market for automotive parts including Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has raided some of the Defendants' offices, pursuant to search warrants. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants relative to these products.

9.     As alleged more fully hereafter, Defendants Furukawa Electric Co. Ltd., Yazaki Corporation, Denso Corporation, G.S. Electech, Inc., and Fujikura Ltd., have pleaded guilty to participating in the automotive parts cartel and have agreed to pay substantial fines for their unlawful conduct. These Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive parts including Wire Harness Systems, Instrument Panel Clusters, Fuel Senders, Heating Control Panels, Automotive Bearings and Occupant Safety Systems sold to automobile manufacturers and others in the

United States. The combination and conspiracy engaged in by these Defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.     As part of their plea agreements, Defendants have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

11.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiff, the State of Indiana, and its political subdivisions, from January 1, 2000 through at least January 1, 2010 has paid artificially inflated prices for automotive parts and has thereby suffered antitrust injury to their business or property.

12.     Plaintiff brings this action for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and for damages and attorneys' fees pursuant to Indiana Code §§ 24-1-1-1, *et seq*.

### III.     INTERSTATE TRADE AND COMMERCE

13. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

14. During the Period, Defendants manufactured, sold and shipped substantial quantities of Automotive Wire Harness Systems in a continuous and uninterrupted flow of interstate commerce.

### IV.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) and  Title 28, United States Code, Sections 1331 and 1337.  This Court also has subject matter jurisdiction over Plaintiff's Indiana state law

claims pursuant to 28 U.S.C. §§ 1332 and 1367 in that Plaintiff is a sovereign state, Defendants are citizens of different states and the amount in controversy exceeds $75,000.

16.     Venue is proper in this district pursuant to 15 U.S.C. §§ 22 and 26, and  pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

17.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (1) committed acts in this district in furtherance of the conspiracy alleged herein and directed the unlawful conspiracy through persons or entities located in this district, including the fixing of prices of automotive parts sold to purchasers in this district; (2) transacted business in the United States, including in this district; (3) directly or indirectly sold or marketed substantial quantities of automotive parts including Automotive Wire Harness Systems throughout the United States, including in this district; (4) had substantial aggregate contacts with the United States as a whole, including in this district.  Accordingly, each of the Defendants maintained minimum contacts with this district that are more than sufficient to subject it to service of process and to comply with due process of law.

**V.     PARTIES**

18.     Plaintiff, the State of Indiana, brings this action by its Attorney General, Greg Zoeller, on behalf of itself and all of its political subdivisions as defined in Ind. Code § 34-6-2-110.  The Attorney General is expressly authorized to bring this action pursuant to Ind. Code §§

6

24-1-1-5.1, 24-1-1-5.2, 24-1-2-5.2, and 24-1-2-7. Plaintiff has purchased numerous vehicles with automotive parts, including Automotive Wire Harness Systems, indirectly from one or more Defendants. .

### The Delphi Defendants

19.     Defendant Delphi Automotive LLP is headquartered in Troy, Michigan and is a limited liability partnership incorporated under the laws of England and Wales. Delphi Automotive LLP, together with its subsidiaries and affiliates, manufactured automotive parts including Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Period, including in this district.

20.     Defendant Delphi Automotive Systems, LLC is incorporated in Delaware and headquartered in Troy, Michigan. Delphi Automotive Systems, LLC manufactured Automotive Parts including Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Period, including in this District.

21.     Defendant Delphi Automotive LLP and Delphi Automotive Systems, LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

22.     Delphi Automotive LLP and Delphi Automotive Systems, LLC were both formed in 2009 to acquire certain automotive parts assets from Delphi Corporation and its subsidiaries which were then in bankruptcy. Delphi Automotive LLP and Delphi Automotive Systems, LLC continued the automotive parts including Automotive Wire Harness Systems business that had been conducted by Delphi Corporation and its subsidiaries prior to their entry into the bankruptcy proceedings hereinafter more fully described.

23.     In December 2004, for example, Delphi Corporation and Furukawa Electric (defined below) announced the creation of a joint venture responsible for selling automotive

parts including Automotive Wiring Harness Systems to Toyota in North America. The joint

venture- named Delphi Furukawa Wiring Systems LLC- was based in Warren, Ohio. As

Furukawa Electric stated in a press release:

> Delphi Furukawa Wiring Systems LLC has the abilities for design,
> development and quality control of Wiring Harness succeeded
> from Furukawa Electric and the abilities for system integration,
> manufacturing and customer support in North America from
> Delphi, in order to meet and exceeds [sic] the customer's
> expectations. The joint venture is responsible for the sales and
> engineering activities for the Wiring Harness, which both Delphi
> and Furukawa Electric have agreed upon for Toyota programs in
> North America, and it will take charge of sales activities directly to
> the customer. Regarding the manufacturing of Wiring Harness, the
> joint venture will utilize existing Delphi's operation facility under
> its direction, in order to put know-how from the both parent
> companies.

24.    In October, 2005, Delphi Corporation and certain U.S. subsidiaries and affiliates,

including Delphi Furukawa Wiring Systems LLC, filed 42 petitions for Chapter 11 bankruptcy

protection. These proceedings were jointly administered in the United States Bankruptcy Court

for the Southern District of New York.  *See* Docket No. 05-44481 (Delphi Corporation); 05-

47452 (Delphi Furukawa Wiring Systems LLC).

25.    In 2006, Delphi Furukawa Wiring Systems LLC, opened a 5,500 square foot

Customer Service Center at 2311 Green Road in Ann Arbor, Michigan, near the Toyota

Technical Center.

26.    On July 30, 2009, the Bankruptcy Court approved a modified plan of

reorganization. [Case No. 05-44481, Docket No. 18707]. The modified plan of reorganization

became effective on October 6, 2009 (the "Effective Date").

27.    On October 6, 2009, Delphi Corporation (which in bankruptcy had changed its

name to DPH Holdings Corporation) substantially consummated the terms of the modified plan

of reorganization. On that date, Delphi Automotive LLP, through subsidiaries and affiliates

owned and controlled by it, acquired substantially all of the bankrupt Delphi entities' global core businesses, including the portion of the bankrupt Delphi entities' Automotive Wire Harness Systems business.

28.     Following the Effective Date, the Delphi Defendants continued the Automotive Wire Harness Systems supply relationships that had been developed by the bankrupt entities, including, for example, Delphi Furukawa Wiring Systems LLC's supply relationship with Toyota. Delphi Automotive Systems, LLC currently maintains and operates the Delphi Ann Arbor Customer Service Center in Ann Arbor, Michigan near the Toyota Technical Center. On March 15, 2010 Toyota recognized "Delphi Automotive" as one of its top suppliers for 2010, noting "wire harness" among the products supplied.

29.     Following the Effective Date, the Delphi Defendants continued to sell Automotive Wire Harness Systems pursuant to, and as part of their participation in furtherance of, the conspiracy alleged herein. Starting on October 6, 2009 and after, the Delphi Defendants sold a significant number of Automotive Wire Harness Systems in the United States at supra-competitive prices.  For 2010 alone, Delphi Automotive LLP reported $5.6 billion in total sales for its Electronic/Electronic Architecture business segment, which included significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy.

### The Denso Defendants

30.     Defendant Denso Corp. is a Japanese corporation. Defendant Denso Corp., directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

31.     Defendant Denso International America, Inc. is a Delaware corporation with its

principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corp. Defendant Denso International America, Inc. manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent. Defendants, Denso Corp., and Denso International America, Inc., shall collectively be referred to herein as the "Denso Defendants" or "Denso."

### The Fujikura Defendants

32.     Defendant, Fujikura Ltd., is a Japanese corporation. Defendant Fujikura, Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

33.     Defendant, Fujikura America, Inc., is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is a subsidiary of and wholly owned and/or controlled by its parent, Fujikura Ltd. Defendant Fujikura America, Inc., manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent. Defendants Fujikura, Ltd., and Fujikura America, Inc., shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

### The Furukawa Defendants

34.     Defendant Furukawa Electric Co., Ltd. ("Furukawa Electric") is a Japanese corporation. Defendant Furukawa Electric, directly and/or through its subsidiaries, which it

wholly owned and/or controlled- manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

35.    Defendant American Furukawa, Inc. ("American Furukawa"), is a Delaware corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric. Defendant American Furukawa manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent.

36.    Defendant Furukawa Wiring Systems America, Inc., f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation ("Furukawa Wiring") is a Delaware corporation with its principal place of business in El Paso, Texas. Defendant Furukawa Wiring is 60% owned by Furukawa Electric and 40% owned by American Furukawa. During the Period, Furukawa Wiring operated as a joint venture between Lear Corporation and Furukawa Electric that manufactured, distributed or sold automotive parts including Automotive Wire Harness Products in the United States. In June 2010, Furukawa Electric purchased all of Lear's remaining interest.

37.    Defendants Furukawa Electric, American Furukawa and Furukawa Wiring shall collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

## The Lear Defendants

38.    Defendant Lear Corp., is a Delaware corporation with its principal place of business in Southfield, Michigan. Defendant Lear directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts

including Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

39.     Defendant, Kyungshin-Lear Sales and Engineering, LLC, is a Delaware corporation with its principal place of business in Selma, Alabama. It is a joint venture between Defendant Lear Corp., and Kyungshin Corporation of South Korea. Defendant Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

40.     Defendants, Lear Corp., and Kyungshin-Lear Sales and Engineering, LLC, shall collectively be referred to herein as the "Lear Defendants" or "Lear."

41.     Lear filed for Chapter 11 bankruptcy protection on July 7, 2009.  Starting in November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

**The Leoni Defendants**

42.     Defendant, Leoni AG, is a German corporation. Defendant Leoni AG directly and/or through its subsidiaries, which it wholly owned and/or controlled- manufactured, marketed and/or sold automotive parts including automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

43.     Defendant, Leoni Wiring Systems, Inc., is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leoni Wiring Systems, Inc. manufactured,

marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its German parent.

44.     Defendant Leonische Holding, Inc., is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leonische Holding, Inc., manufactured, marketed and/or sold automotive parts including Wire Harness Systems that were, purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its German parent.

45.     Defendant Leoni Wire Inc., is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts. It is a subsidiary of and wholly owned and/or controlled by its parent Leoni AG. Defendant Leoni Wire, Inc., manufactured, marketed or sold automotive parts including Automotive Wire Harness Products that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its German parent.

46.     Defendant Leoni Kabel GmbH is a German corporation. Defendant Leoni Kabel GmbH manufactured, marketed or sold automotive parts including Automotive Wire Harness Products that were purchased throughout the United States, including in this district, during the Period.

47.     Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., and Leoni Kabel GmbH shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

48.     Defendant Sumitomo Electric Industries, Ltd., is a Japanese corporation. Defendant Sumitomo Electric Industries, Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

49.     Defendant Sumitomo Electric Wintec America, Inc., is a Kentucky corporation with its principal place of business in Edmonton, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant Sumitomo Electric Wintec America, Inc., manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent. Defendant Sumitomo Electric Wintec America, Inc., manufactured, marketed or sold automotive parts including Automotive Wire Harness Products that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent.

50.     Defendant Sumitomo Wiring Systems, Ltd., is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd., has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." It directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

51.     Defendant Sumitomo Electric Wiring Systems, Inc., is a Delaware corporation

14

with its principal place of business in Bowling Green, Kentucky. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd., and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Electric Wiring Systems, Inc., manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

52.     Defendant K&S Wiring Systems, Inc., is a Delaware corporation with its principal place of business in LaVergne, Tennessee. It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent.

53.     Defendant Sumitomo Wiring Systems (U.S.A.) Inc., is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

54.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc. shall collectively be referred

to herein as the "Sumitomo Defendants" or "Sumitomo."

## The Yazaki and S-Y Systems Defendants

55.    Defendant Yazaki Corporation is a Japanese corporation. Defendant Yazaki Corporation- directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

56.    Defendant S-Y Systems Technologies Europe GmbH ("S-Y Systems") is a German corporation. Defendant S-Y Systems directly and/or through its subsidiaries, which it wholly owned and/or controlled- manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

57.    Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Yazaki Corporation. Defendant Yazaki North America Inc. manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of its Japanese parent.

58.    Defendant S-Y Systems Technologies America, LLC ("S-Y Systems") is a Delaware corporation with its principal place of business in Dearborn, Michigan. It is currently a wholly owned subsidiary of and/or controlled by its parent Defendant Yazaki Corporation, but was formerly a wholly owned subsidiary of and/or controlled by Defendant S-Y Systems.

Defendant S-Y Systems Technologies America, LLC manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period. At all times during the Period, its activities in the United States were under the control and direction of either its German parent, during the time it was owned and controlled by S-Y Systems, or its current Japanese parent, Yazaki Corporation.

59.     Yazaki Corporation, Yazaki North America, Inc. and S-Y Systems Technologies America, LLC, shall collectively be referred to herein as the "Yazaki Defendants" or "Yazaki."

**The Tokai Rika Defendants**

60.     Defendant Tokai Rika Co., Ltd., is a Japanese company with its principal place of business in Toyota, Japan. Defendant Tokai Rika, Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold automotive parts including Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

61.     Defendant TRAM, Inc., d/b/a Tokai Rika U.S.A. Inc., is a Michigan Corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika, Ltd. During the Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed and/or sold automotive parts including Wire Harness Systems that were purchased throughout the United States, including this district, during the Period.

62.     Tokai Rika, Ltd. and TRAM, Inc. d/b/a Tokai Rika U.S.A.  Inc., are herein referred collectively as the "Tokai Rika Defendants" or "Tokai Rika."

**The G.S. Electech Defendants**

63.     Defendant GS Electech, Inc., is a Japanese corporation with its principal place of business in Toyota, Japan. Defendant GS Electech, Inc., directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

64.     Defendant G.S. Wiring Systems, Inc., is an Ohio corporation based in Findlay, Ohio. Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc. G.S. Wiring Systems Inc. manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

65.     Defendant G.S.W. Manufacturing Inc. is an Ohio corporation based in Findlay, Ohio.  Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc. G.S.W. Manufacturing Inc. represents itself as a Tier 1 and 2 supplier of Automotive Wire Harness Systems. G.S.W. Manufacturing Inc., manufactured, marketed and/or sold automotive parts including Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Period.

## VI.     AGENTS AND CO-CONSPIRATORS

66.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

67.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy

or in furtherance of the anti-competitive conduct through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

68.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs. Further, the acts alleged in this Complaint done by Defendants were authorized, ordered and condoned by their parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

69.     Defendants are liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

## VII.    FACTUAL ALLEGATIONS

### A.    The Automotive Wire Harness System Industry

70.     Automotive Wire Harness Systems act as the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle. To ensure safety and basic functions (e.g., moving, turning and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics which operate using control signals running on electrical power. The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.

71.     Automotive vehicles contain masses of wires that can amount to several

kilometers in length. A vehicle's wiring system is organized into multiple wire harnesses. Wire harnesses provide organized connection points for multiple wiring configurations. The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

72.     Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features. Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

73.     Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process. They are also installed in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

74.     OEMs, primarily consisting of large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors, purchase Automotive Wire Harness Systems directly from Defendants for their new cars. Automotive Wire Harness Systems may also be purchased by component manufactures who then supply such systems to OEMs. These component manufacturers are also called "Tier I Manufacturers" in the industry. Tier I Manufacturers supply Automotive Wire Harness Systems directly to an OEM.

75.     When purchasing Automotive Wire Harness Systems, OEMs issue Requests for Quotation ("RFQs") to the automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs typically award the business to the selected automotive parts supplier for four to six years, or the life of the model at issue. Typically, the bidding process begins approximately three years prior to the start of production of a new model. Foreign OEMs procure parts for United States-manufactured vehicles both

abroad and in the United States.

76.     Automotive Wire Harness Systems manufactured, distributed and sold for a particular make and model of a vehicle or other product by Defendants during the Class Period are not qualitatively distinguishable in any material way.

77.     Defendants comprise the majority of automotive parts suppliers who manufacture Automotive Wire Harness Systems for sale to OEMs.

78.     Defendants and their co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (1) in the United States for installation in vehicles manufactured and sold in the United States (including Indiana), (2) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States (including Indiana), and (3) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States (including Indiana).

79.     Plaintiff, and its political subdivisions, purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants. By way of example, an owner of a vehicle may indirectly purchase an Automotive Wire Harness System from Defendants as part of purchasing or leasing the new vehicle. An owner of a vehicle may also indirectly purchase a replacement Automotive Wire Harness System from Defendants when repairing a damaged vehicle or where the vehicle's Automotive Wire Harness System is defective.

80.     The global Automotive Wire Harness Systems market size reached $21.9 billion in 2009, and increased by 32.2% to $29 billion in 2010. According to ResearchInChina, a leading source for international market research and market data, the Automotive Wire Harness System market is steadily growing, and is expected to be $32 billion in 2012.

81.     The global Automotive Wire Harness Systems market is dominated and controlled by large manufacturers, the top six of which are Defendants who control almost 90% of the global market; of those, four control almost 77% of the global market.

82.     Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009. As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market." In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere. Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and finally General Motors. In the Western Hemisphere, it supplies Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, and Toyota.

83.     Defendant Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.

84.     Defendant Delphi is the third largest maker of Automotive Harness Systems as of 2009. It controls 16.71% of the global market. Its two largest customers are General Motors and Ford.

85.     Defendant Lear controls almost 5% of the global market for Automotive Wire Harness Systems. Lear supplies Toyota, General Motors, Ford, and BMW.

86.     Defendant Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

87.     Fujikura controls 2.69% of the global market for Automotive Wire Harness Systems. Fujikura supplies Volkswagen and Subaru, among other OEMs.

88.     Defendant Leoni controls 6% of the global market for Automotive Wire Harness

Systems.

89.    Tokai Rika supplies Toyota, among other OEMs.

90.    S-Y Systems supplies Ford, among other OEMs.

91.    By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world. During the Period, Defendants, who in a competitive market would be horizontal competitors with one another, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Automotive Wire Harness Systems. As a result of their unlawful conduct, Defendants did not compete with other Automotive Wire Harness Systems manufacturers, but instead enjoyed business insulated from competition from the other manufacturers of such products.

**B.    Defendants Increased the Prices for Automotive Parts Including Wire Harness Systems despite Steady Costs**

92.    In a competitive market, falling material and labor costs would lead to decreased prices over time, as well as the existence of and the desire to maintain economies of scale, because each competitor would fear other competitors would attempt to take advantage of lower or predictably steady costs to lower prices in order to capture market share. In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs because the conspirators know that they will not lose sales to lower-priced competitors.

93.    The price of automotive parts including Wire Harness Systems increased during the Period, while major input costs virtually remained the same. In fact, according to ResearchInChina, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. Thus, both of these Defendants had the power to effectively

keep their costs steady and knew that due to their control of a key input in the Automotive Wire Harness Systems, the costs of manufacture would likely remain steady. In a competitive market, steady input costs should not have resulted in rising prices to Defendants' customers for Automotive Wire Harness Systems.

94.     Defendants' unwarranted, anti-competitive price increases have resulted in Plaintiff and its political subdivisions paying supra-competitive prices.

C.      **The Structure and Characteristics of the Automotive Parts Market Including the Wire Harness Systems Market Renders the Conspiracy More Plausible**

95.     The structure and other characteristics of the automotive parts markets including the Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the automotive parts market including the Wire Harness Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

(1)     **The Automotive Parts Market Including the Wire Harness Systems Market Has High Barriers to Entry**

96.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to join the industry and increase competition. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

97.     There are substantial barriers to entry that preclude, reduce, or make more difficult entry into the automotive parts market including the Wire Harness Systems market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation,

distribution infrastructure, skilled labor, and long-standing customer relationships.

98.     In addition, OEMs cannot change automotive parts suppliers randomly after they choose a supplier because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model.  Designing Automotive Wire Harness Systems pursuant to such stringent specifications involves a great degree of sunk costs and resources.  Consequently, the design must be synergized by automotive parts manufacturers and OEMs.   Additionally, a new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at obtaining the bid for any model of car. Thus, it would be difficult for a new entrant to successfully enter the market.

### (2)     There is Inelasticity of Demand for Automotive Parts Including Automotive Wire Harness Systems

99.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

100.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

101.     Demand for automotive parts including Wire Harness Systems is highly inelastic,

with no close substitutes for these products, enabling the cartel to raise prices above competitive levels, without triggering lost sales. In addition, customers must purchase automotive parts including Wire Harness Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### (3)    The Market for Automotive Parts Including Wire Harness Systems Is Highly Concentrated

102.    A highly concentrated market is more susceptible to collusion and other anti-competitive practices because the fewer competitors there are, the easier collusion is to coordinate.

103.    As discussed above, Defendants dominate the automotive parts market including Wire Harness Systems market. Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Lear controls almost 5%; Furukawa controls almost 4%; and Leoni controls 6%.

### (4)    Defendants had Ample Opportunities to Conspire

104.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

105.    For example, Defendants have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan, which provided the means and opportunity to further the conspiracy alleged herein. According to the NAIAS website, Defendant Denso was a premier sponsor of the 2012 event, held January 9 to January 22 for that year. Defendants have also regularly attended the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

D.      **Government Investigations**

106.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts including Wire Harness Systems.

107.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC"). One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

108.    On February 8, 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anti-competitive conduct related to the manufacturing and sale of automotive parts including Automotive Wire Harness Systems. The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010. Specifically, EC investigators raided the offices of Leoni, S-Y Systems, and Yazaki. "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

109.    Defendants S-Y Systems and Leoni have admitted that they are cooperating with the antitrust investigators. Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is part of an investigation into anti-competitive practices among automotive electrical and electric component suppliers. In addition, Delphi has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market." Delphi LLC stated that it is cooperating fully with the European competition authorities. Leoni AG has also stated

that it is cooperating with the antitrust investigators, and Leoni Kabel GMBH is also being investigated by EC authorities.

110.    In February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric, and Yazaki Corp. as part of an expansive investigation into collusion in the industry dating back to at least 2003.

111.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anti-competitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

112.    On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese automotive parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including Defendants Denso, Tokai Rika, and Yazaki's subsidiary in Canton Township, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

113.    In 2010, the FBI also raided the offices of TRAM and executed search warrants related to unfair competition, price-fixing and bid rigging of Automotive Wire Harness Systems.

114.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a neutral and detached magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant.  In other words, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a neutral and detached

magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.    JFTC Cease and Desist Orders

115.    On January 19, 2012, the JFTC issued Cease and Desist orders against Fujikura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation, after investigating the companies' bidding practices with regard to Automotive Wire Harness Systems and related products.

116.    The JFTC press release regarding the orders states "the JFTC gave the enterprises in question an advance notification on the contents of the orders and an opportunity to present their views and to submit evidence. Considering the views and evidence from them, the JFTC issued the orders."

117.    Having evaluated all of the evidence before it, including rebuttal evidence from the accused companies, the JFTC determined that the companies had engaged in illegal anti-competitive activities. Finding that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan and Fuji (manufacturer of Subaru-brand vehicles) on Automotive Wire Harness Systems and related products, the JFTC stated that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation carried out their conspiracy by "appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."

118.    The JFTC stated that the conspiracy began as early as July 2000.

119.    The JFTC ordered each Defendant to make surcharge payments totaling 12.9 billion yen.

120.    The JFTC explained, in its press release, that Furukawa Electric had also

participated in the described bid rigging conspiracy, in violation of the Antimonopoly Act.

      **F.    Guilty Pleas**

      121.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price fixing and bid rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers. Three Furukawa executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States.

      122.    Furukawa Electric was charged with price fixing in violation of the Sherman Act.

      123.    Furukawa Electric pled guilty for its role in a conspiracy to rig bids for and to fix the prices of the sale of Automotive Wire Harnesses and related products sold to automobile manufacturers in the United States and elsewhere. The DOJ announced in a press release that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

      124.    The plea agreements discussed herein are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the automotive parts industry. According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives-Junichi Funo ("Funo"), Hirotsugu Nagata ("Nagata"), and Tetsuya Ukai ("Ukai")—engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere

      125.    According to the Information filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

      (1)    participating in meetings, conversations, and communications  in the

United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(2)      agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(3)      agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(4)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(5)      submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(6)      selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and non-competitive prices;

(7)      accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and non-competitive prices;

(8)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid rigging and price fixing scheme; and employing measures to keep their conduct secret, including but not limited to using code names and

31

meeting at private residences or remote locations; and

(9)     employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

126.    "As a result of this international price fixing and bid rigging conspiracy, automobile manufacturers paid non-competitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division. "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

127.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

128.    At its November 14, 2011 Plea and Sentencing hearing, Defendant Furukawa Electric pleaded guilty, and was ordered to pay its $200 million fine within 45 days. At the hearing, Defendant Furukawa Electric described its participation in the conspiracy as follows:

> From the time period listed in the Information, that is, approximately from January, 2000 to January, 2010, officers and employees of my company had discussions with employees of competitors that also manufactured and sold automotive wire harness products...These discussions took place in face-to-face meetings or by telephone. The discussions took place in the United States and elsewhere.
>
> During ... such meetings and conversations, a conspiracy was formed and agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis and to rig bids quoted to automobile manufacturers for automotive wire harnesses and related products. Therefore, as a result of these meetings, my

company produced and sold automotive wire harnesses and related products that were the subject of the illegal price fixing agreements that my company had made with competitors. Those products and the payments for those products traveled in interstate and foreign commerce and substantially affected interstate and foreign trade and commerce.

For the purposes of this plea agreement, during the time period of January, 2000 to January, 2010, our sales of automotive wire harnesses and related products affecting U.S. auto manufacturers totaled approximately $839 million.

Finally, we note to the Court that some of the products affected by the conspiracy were sold to automobile manufacturers by one of our subsidiaries [American Furukawa], which is located here in the Eastern District of Michigan.

Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at 14-16.

129.   Furukawa Electric's executives Funo, Nagata, and Ukai also admitted their participation in the unlawful cartel in open court:

(1)   At his October 24, 2011, Guilty Plea Hearing, Furukawa executive Funo admitted that he participated in a conspiracy to restrain trade. Mr. Funo admitted entering into agreements with competitors, i.e. Defendants herein, in order to set prices and maintain them, including rigging bids that were solicited from customers. The agreements also sought to control, and did control, price adjustments. In Mr. Funo's own words, he "did price fixing for automotive parts." That price fixing "generally involved ... wiring harnesses and related products." The price fixing affected the sales of goods throughout the United States. Mr. Funo was personally present at meetings during which such unlawful agreements were reached, including meetings that occurred in the Eastern District of Michigan. Pursuant to his plea, Mr. Funo was sentenced to one year of prison,

33

fined $20,000, and pledged to cooperate in the DOJ's ongoing investigation.

(2)     At his October   24, 2011 Guilty Plea Hearing, Furukawa executive Hirotsugu Nagata admitted that he participated in "an agreement to submit non-competitive bids in an amount greater  than $100 million." The purpose of the agreement was to "suppress and eliminate competition in the automotive parts industry." In Mr. Nagata's own words, he furthered the unlawful conspiracy with Defendants by having "a meeting [with] co-conspirators and some agreement [on] price for automobile manufacturing parts" primarily Automotive Wire Harness Systems. He personally participated in "several" unlawful  meetings to further the conspiracy, at which Defendants made agreements on pricing for Automotive Wire Harness Systems, including rigging bids. Some of the meetings occurred within the Eastern District of Michigan, and Mr. Nagata conceded that the unlawful agreements would impact businesses with their principal place of business within the Eastern District of Michigan. Mr. Nagata admitted that he participated in a combination and conspiracy with  co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive parts sold to certain automobile manufacturers in the United States and elsewhere, in violation of the Sherman Act, 15 U.S.C. § 1.   This occurred from as early as March 2004 and continued until at least February 2010.

(3)     At his November 10, 2011 Guilty Plea and Sentencing Hearing, Furukawa executive Ukai stated that he "fix[ed] price[s] over parts – auto parts with other suppliers." He acknowledged that he met with competitors "in order to fix prices

34

and rig bids with respect to wire harnesses and related products," and conceded that the price fixing meetings occurred both within the United States and elsewhere. He also acknowledged that the price fixing would affect commerce in the United States and elsewhere, including in the Eastern District of Michigan through a Furukawa subsidiary, presumably American Furukawa. In addition, Mr. Ukai agreed that the commerce affected exceeded $100 million. As part of his plea, Mr. Ukai agreed to serve 18 months in prison and pay a $20,000 fine for his role in the conspiracy.

130.   On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had agreed to pay a $470 million fine and to plead guilty to a three-count criminal information charging Yazaki Corporation with: (1) participating in a combination and conspiracy with its coconspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems and related products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere from at least as early as December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (3) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to certain

automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

131.   In addition to Yazaki Corporation, four executives from Yazaki Corporation (all Japanese nationals)  Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. These four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years. The two-year sentences are the longest terms of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

132.   On March 26, 2012, the DOJ announced that Defendant Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Electronic Control Units sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Heater Control Panels sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. The "Electronic Control

Units" referenced herein are included within the definition of Automotive Wire Harness Systems alleged in this Complaint.

133.     On April 3, 2012, the DOJ announced that Defendant G.S. Electech Inc., agreed to plead guilty and pay a $2.75 million criminal fine to a one-count criminal information charging G.S. Electech Inc., with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Speed Sensor Wire Assemblies sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2003 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. The "Speed Sensor Wire Assemblies" referenced herein are included within the definition of Automotive Wire Harness Systems alleged in this Complaint.

134.     On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd., agreed to plead guilty and pay a $20 million criminal fine to a one-count criminal information charging Fujikura with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harnesses and related products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

135.     To date, Defendants that have pled guilty to their participation in the Automotive Wire Harness Systems cartel have agreed to pay criminal fines totaling $770.75 million, among the largest criminal cartels ever successfully prosecuted by the DOJ.

### VIII.   PLAINTIFF SUFFERED ANTITRUST INJURY

136.     Defendants' price fixing conspiracy had the following effects, among others: (1)

Price competition has been restrained or eliminated with respect to automotive parts including Automotive Wire Harness Systems; (2) The prices of automotive parts including Automotive Wire Harness Systems have been fixed, raised, maintained or stabilized at artificially inflated levels; and (3) Indirect purchasers of automotive parts including Automotive Wire Harness Systems have been deprived of free and open competition.

137.     During the Period, Plaintiff paid supra-competitive prices for automotive parts including Automotive Wire Harness Systems.

138.     The markets for Wire Harness Systems and the market for cars are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market. Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems. As Lear Corporation stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

139.     Automotive parts including Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiff, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiff.

140.     By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury to their businesses or property, having paid higher prices for automotive parts including Automotive Wire Harness Systems than they would have paid in the absence of Defendants'

illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and is compensable under the indirect purchaser laws of Indiana.

## IX.   PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.   The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover Their Claims

141.   Plaintiff and its political subdivisions, in the exercise of reasonable diligence, did not know and could not have known of the existence of the conspiracy and unlawful combination alleged herein until September 29, 2011 at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price fixing and bid rigging conspiracy alleged herein.

142.   Before that time, Plaintiff and its political subdivisions were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for automotive parts throughout the United States during the Period. No information, actual or constructive, was ever made available to Plaintiff that even hinted to Plaintiff that it was being injured by Defendants' unlawful conduct.

143.   Plaintiff and its political subdivisions are indirect consumers who purchased or leased automobiles or purchased Wire Harness Systems to replace or repair damaged or defective Wire Harness Systems in their automobiles.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the DOJ's September 29, 2011 announcement alleged above.

144.   No information in the public domain was available to Plaintiff prior to the DOJ's

announcement on September 29, 2011 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price fix and rig bids for Automotive Wire Harness Systems. Plaintiff had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

145.   For these reasons, the statute of limitations as to Plaintiff's claims did not begin to run, and has been tolled with respect to the claims that Plaintiff has alleged in this Complaint.

### B.   Fraudulent Concealment Tolled the Statute of Limitations

146.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

147.   By its very nature, Defendants' anti-competitive conspiracy and unlawful combinations were inherently self-concealing. Automotive parts are not exempt from antitrust regulation and, thus, Plaintiff reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

148.   For instance, the DOJ charged Defendants Fujikura Ltd., Furukawa Electric, G.S. Electech, Inc. and Yazaki Corporation with, among other unlawful acts, "employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations." These corporate Defendants have since pled guilty to charges levied against them by the DOJ.

149.   In addition, the DOJ charged individual corporate officers of certain Defendants

40

with using code names and engaging in secret, conspiratorial meetings to hide Defendants' conspiracy from the public and competition authorities. To date, Junichi Funo from Furukawa and Tsuneaki Hanarnura, Ryoji Kawai, Shigeru Ogawa, and Hisamitsu Takada from Yazaki Corporation have all pled guilty to charges levied against them by the DOJ. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the lawfulness of Defendants' automotive parts prices.

150.    Plaintiff could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

151.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pled guilty in this Court to criminal violations of the Sherman Act. These Defendants have not provided any documents and information about these admitted acts of concealment to Plaintiff.

152.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and its political subdivisions had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 29, 2011, at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to

plead guilty for its role in the criminal price fixing and bid rigging conspiracy alleged herein.

153.    For these reasons, the statute of limitations applicable to Plaintiff and its political subdivisions was tolled and did not begin to run until September 29, 2011.

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act**
**(Injunctive Relief)**

154.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

155.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § l).

156.    At least as early as January 2000, and continuing through the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Plaintiff and its political subdivisions who purchased automotive parts, including Automotive Wire Harness Systems, for official use and not for resale, as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator, thereby creating anti-competitive effects.

157.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

158.    The anti-competitive acts were intentionally directed at the United States market for automotive parts and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for automotive parts, including Automotive Wire Harness Systems,

throughout the United States.

159. The conspiratorial acts and combinations have caused unreasonable restraints in the market for automotive parts, including Automotive Wire Harness Systems.

160. As a result of Defendants' unlawful conduct, Plaintiff and its political subdivisions as indirect purchasers purchased automotive parts, including Automotive Wire Harness Systems, and have been harmed by being forced to pay inflated, supra-competitive prices for said products.

161. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

161. Defendants' conspiracy had the following effects, among others:

    (1) Price competition in the market for automotive parts, including Automotive Wire Harness Systems, has been restrained, suppressed, and/or eliminated in the United States;

    (2) Prices for automotive parts, including Automotive Wire Harness Systems, sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States.

    (3) Plaintiff and its political subdivisions who purchased automotive parts, including Automotive Wire Harness Systems, indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

163.    Plaintiff and its political subdivisions have been injured and will continue to be injured in their business and property by paying more for automotive parts, including Automotive Wire Harness Systems, purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

164.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

165.    Plaintiff is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of Indiana Code § 24-1-2-1 (Damages)

166.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

167.    Indiana Code § 24-1-2-1 provides that:

> Every scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce, or to deny or refuse to any person participation, on equal terms with others, in any telegraphic service transmitting matter prepared or intended for public use, or to limit or reduce the production, or increase or reduce the price of merchandise or any commodity, or to prevent competition in manufacturing, within or without this state, is illegal, but this chapter may not be construed to apply to or repeal, modify or limit, or make unlawful any of the powers, rights or privileges now existing or conferred by law upon any person. A person who makes such a contract, engages in such a combination, or enters into such a scheme, or does within this state any act in furtherance of such a contract, combination, or scheme entered into without this state, commits a Class A misdemeanor.

168.    Defendants and unnamed conspirators entered into and carried out a scheme, contract, or combination in restraint of trade or commerce in violation of Indiana Code § 24-1-2-1. Defendants' agreement to fix, raise, maintain, and stabilize the prices of automotive parts, including Automotive Wire Harness Systems, in the United States, including Indiana, and to allocate customers for said products was a violation of Indiana Code § 24-1-2-1.

169.    The acts undertaken by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

170.    Beginning at least as early as January 1, 2000, and continuing through at least January 1, 2010, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, and/or other representatives, entered into and participated in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize prices for automotive parts, including Automotive Wire Harness Systems, sold in the United States, including Indiana.

171.    The Defendants' anti-competitive acts were intentionally directed at the automotive parts market, including Automotive Wire Harness Systems, had a substantial and foreseeable effect on interstate commerce throughout the United States and within Indiana.

172.    The Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the automotive parts market, including Automotive Wire Harness Systems. As a result of Defendants' unlawful agreement, understanding, combination, contract, and conspiracy, Plaintiff and its political subdivisions have been injured

45

in their business and property. Plaintiff and its political subdivisions have been harmed by being forced to pay higher prices for automotive parts, including Automotive Wire Harness Systems, than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

173.    In formulating and carrying out their unlawful agreement, understanding, combination, contract, and conspiracy, Defendants and their co-conspirators carried out the things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

174.    Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

(1)    Price competition in the automotive parts market, including Automotive Wire Harness Systems, was restrained and/or eliminated in the United States, including Indiana;

(2)    Prices for automotive parts, including Automotive Wire Harness Systems, sold by Defendants have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States and in Indiana; and

(3)    Plaintiff and its political subdivisions have been deprived of the benefits of free and open competition.

175.    Pursuant to Indiana Code § 24-1-2-5.1: "The attorney general may bring an action on behalf of the state or a political subdivision (as defined in IC 34-6-2-110) for injuries or damages sustained directly or indirectly as a result of a violation of this chapter."

176.    Pursuant to Indiana Code § 24-1-2-7:

(a) Any person whose business or property is injured by a violation of this chapter may bring an […] and is entitled to recover a penalty of threefold the damages awarded in the action, together with the costs of suit, including reasonable attorney's fees.

(b) The attorney general may bring an action under this section on behalf of the state or a political subdivision if the state or political subdivision has been directly or indirectly injured by a violation of this section.

177.    Accordingly, Plaintiff, on behalf of itself and its political subdivisions, seeks to recover (1) all damages incurred, both directly and indirectly; (2) said damages to be trebled pursuant to Indiana antitrust law; and (3) the cost of suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(1)    That Defendants, their affiliated, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and form adopting or following any practice, plan, program, or device having an similar purpose or effect;

(2)    That Plaintiff and its political subdivisions recover damages, to the maximum extent allowed by law, and that a joint and several judgment in favor of Plaintiff and its political subdivisions be entered against Defendants in an amount to be trebled to the extent such laws permit;

(3)     That Plaintiff recover its cost of suit, including reasonable attorneys' fees, as provided by law; and

(4)     That Plaintiff and its political subdivisions be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court under the circumstances.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted,

RYNBRANDT & ASSOCIATES, PLLC

Dated:  June 25, 2015

*/s/ Kevin Abraham Rynbrandt*
Kevin Abraham Rynbrandt (P46699)
Business Address:
1000 Front Avenue, N.W.
Grand Rapids, MI  49504
(616) 915-9266
kar@rynbrandt.com
Counsel for Plaintiffs

Indiana Attorney General's Office
Indiana Government Building South
302 West Washington Street
5th Floor
Indianapolis, IN 46204
Phone:  (317) 232 6201
Fax:  (317) 232 7979